UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 22-1749

Caption [use short title]

Motion for: Adjournment of the briefing schedule until July 31, 2023, pursuant to Fed. App. Rule, Granting a Stay of the appeal pursuant to Fed.

Set forth below precise, complete statement of relief sought:

I request an adjournment of the briefing schedule OR a stay of my appeal until the end of the Sup On 11/28/22, The SCOTUS heard oral argumen which raises the same issues of law as those a SDNY in the US v Andrew criminal complaint & While currently pro se, I am seeking representa

United States of America v. Seth Andrew

MOVING PARTY: Seth Andrew           OPPOSING PARTY: The United States of America

☐ Plaintiff    ☑ Defendant
☑ Appellant/Petitioner   ☐ Appellee/Respondent

MOVING ATTORNEY: Seth Andrew (Pro-se)   OPPOSING ATTORNEY: _____
[name of attorney, with firm, address, phone number and e-mail]

370 C. P. West
NYC, NY 10025
212-865-7617, SethAndrew@gmail.com

Court- Judge/ Agency appealed from: SDNY- Judge Cronan

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes  ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☐ Opposed ☑ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:
Has this request for relief been made below? ☑ Yes ☐ No
Has this relief been previously sought in this court? ☐ Yes ☑ No
Requested return date and explanation of emergency:
I request the opportunity to return my briefs no later In Ciminelli, the government conceded that the basis 4/27/22 criminal complaint, an elastic interpretation doctrine" is, and has been, invalid interpretation of

Is oral argument on motion requested?  ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No  If yes, enter date: _____

Signature of Moving Attorney:
s/ Seth Andrew (pro-se)   Date: 1/27/23   Service by: ☐ CM/ECF ☑ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# Appeals Docket: #22-1749
# In the United States Court of Appeals
# For the Second Circuit

United States of America

v.

Seth Andrew

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
(0208-1: 1:22-cr-32-1)
(The Honorable John Cronan)

Motion by Appellee Seth Andrew for Adjournment of the Briefing Schedule until July 31st, 2023 pursuant to Federal Appellate Rules 26 and/or 41 to stay the appeal timeline with an extension of time to file briefs until after Supreme Court decision *#21-1170* in *Ciminelli v. United States of America* has been released and reviewed by counsel.

Seth Andrew (Pro Se)
370 C.P.W
NY, NY 10025
212-865-7617
SethAndrew @ gmail.com

January 27, 2023

May it please the Court:

**Pursuant to Rule of Federal Appellate Procedure 26, appellee, Seth Andrew, moves for an adjournment of the briefing schedule in his case until July 31, 2023. Alternatively, pursuant to Rule of Federal Appellate Procedure 41, he moves for a stay to his appeal until after the decision in #21-1170, *Ciminelli v United States* decision is returned.**

**This is the first adjournment requested in this case, and it is essential to provide Andrew an opportunity to review the upcoming decisions of this US Supreme Court session, especially in regards to *Ciminelli*. The questions presented to the Court in *Ciminelli* concern the invalidity of "right to control" theory of wire fraud, which is also the theory that undergirds the criminal complaint against Andrew. <u>A ruling for the petitioner in *Ciminelli* would mean that the criminal complaint against Andrew charges no offense.</u>**

1. **Pursuant to Rules of Appellate Procedure 26 and/or 41**, appellee Seth Andrew, moves for an adjournment of the briefing schedule in his case until July, 31, 2023 or a stay to a date certain as determined by the court.

2. **This is Mr. Andrew's first substantive motion.** If the extension (26), or stay (41), are not granted, Mr. Andrew's appeal will be significantly prejudiced. The deadline for submission of his Appeal briefs is otherwise today, 1/27/2022. Mr. Andrew was unemployed and/or incarcerated for the past ~18 months and is acting pro se in this matter. However, he is simultaneously seeking appellate counsel with relevant experience with challenging the elastic use of the right-to-control doctrine in wire fraud cases to support his next submission.

3. **When oral arguments were made in *Ciminelli* Mr. Andrew was residing at Federal Correctional Institution at Otisville.** The government took ~16 months, without ever returning an indictment or providing a page of discovery, to sentence Mr. Andrew. Today, all he is requesting is a few more weeks until the Supreme Court releases this year's opinions, so that he may submit the most cogent and comprehensive appeal briefs possible, consistent with federal law. He will remain under the supervision of the Bureau of Prisons, even if an adjournment or stay is granted. As such, there is no danger to the public, federal institutions, the rule of law, or to the goals stated by the sentencing judge under 3553(a) by granting this motion.

4. **This additional time is necessary to provide an opportunity for Mr. Andrew and any future counsel to review the upcoming decisions of this US Supreme Court session, especially in regards to #21-1170, *Ciminelli v United States*.** The questions posed to the court and reviewed in oral arguments in *Ciminelli* address the same, and substantially similar, matters of whom or what entities have the "right-to-control" public funds. This directly relates to the one count of federal wire fraud 18 U.S.C.§ 1343 that Mr. Andrew faced in his Information, and which was the basis of the entire criminal complaint.

5. **The criminal complaint Mr. Andrew received after he was arrested on 4/27/21 cites issues of "control" of funds <u>thirteen</u> separate times.** If the US Supreme Court throws out the elastic right-to-control theory this term, it would seem that the information to which he pleaded, the allocution he offered in court, and the deep remorse he feels–while still factual and honest– were not at the time, and are not now, violations of 18 U.S.C.§ 1343.

6. **The SDNY's use of an expansive and elastic "right-to-control" theory was explicitly disavowed by the Deputy Solicitor General on behalf of the United States federal government in oral arguments in *Ciminelli* on 11/28/22.** It may be fair to say that the "right-to-control" theory is already dead. Justice Gorsuch posited there was a "radical agreement that the Second Circuit misinterpreted the law" and Justice Sotomayor remained "totally confused" about how the right-to-control theory could ever have been workable.

7. **This now discredited theory was the essential component to building the complaint and information in *US v. Andrew*.** Most of the financial transactions made by Mr. Andrew are not in dispute. The fundamental question of law presented by SDNY was that Andrew, the Founder, Superintendent Emeritus, sole authorized bank signatory, and fiduciarily responsible escrow agent for three orphaned accounts of previously dissolved non-profit organizations did NOT have the "right-to-control" or even transfer these funds between banks.

8. **Conversely, SDNY argued that the quasi-public school network of schools, which Andrew also founded, was the "victim" because they were denied a "right to control" these public funds.** After 16 months both SDNY and the sentencing Judge conceded that Mr. Andrew transferred the funds between banks, but there was never any motive or intent to personally enrich himself or others. Andrew deposited these funds instead into a related non-profit that sought to advance the mission and success of the alumni from the previously dissolved organizations.

9. **Andrew's prosecution was singular and unprecedented in numerous ways.** The Sentencing Judge indicated "He did not pocket any of the money that was transferred…He did not spend any of those funds on himself or his family. Mr. Finkel acknowledged he didn't go on vacation, he didn't buy a car…This wasn't a

situation, as (Andrew's Counsel) noted, like many defendants convicted of wire fraud, of someone stealing money to line their own wallet."

10. **The SDNY's theory was based on the notion that Mr. Andrew did *not* have the right-to-control the funds in three orphaned escrow accounts of previously dissolved non-profit entities that he founded.** Instead, SDNY argued that the school network, which was then, and is now, a distinct "Independent Contractor" (See IRS Form 990) to the three dissolved schools.

11. **The FBI and the SDNY ascribed a false nefarious motive for Mr. Andrew's bank transfers.** They argued without evidence that the nonsensical scheme was designed with the intent of denying the network of schools control over escrow funds solely to inflict "pain" and political "retribution" against the network Andrew founded and to which he devoted his professional life.

12. **After 16 months, all parties agreed that there was no actual economic harm, no property harm, nor any personal financial benefit.** Supreme Court decisions in both *Cleveland v. United States* and *Kelly* have found that in order to violate the wire fraud laws, mere "deception or deceit" was insufficient–the object of the scheme had to aim to explicitly obtain money or property. One might assume that SDNY would then have acknowledged the relevance of the Supreme Court decision in *Kelly v. United States,* in which the court found in a resounding 9-0 decision, that money or property must in fact be taken to constitute cases of wire fraud. In Andrew's case, money was moved from one bank to another, but remained in the control of an affiliated non-profit and was never actually stolen by the defendant.

13. **Andrew's role as escrow agent, founder, and sole remaining signatory of the three dissolved school accounts gave him regulatory authority.** In addition, Andrew felt an obligation to protect against these funds being lost, of "allocation, exclusion, and control" of these funds. Indeed, Bank-1 indicated to Andrew on multiple occasions that if he did *not* transfer the funds, they were going to be sent to the New York State Comptroller's Lost Money program. This was not an idle threat, public records indicate that the school network has "lost money" in multiple states and jurisdictions where they now operate.

14. **The overwhelming decisions *Cleveland*, *Kelly*, *McNally*, and likely *Ciminelli* and *Percoco* bear directly on Andrew's conviction and likelihood of success on appeal because they show the Court's desire to limit the scope of fraud exclusively to the "protection of property rights" while also encouraging states to set their own clear standards.** In both *Ciminelli* and *Percoco* Justices expressed significant reservations as to why the cases weren't dealt with in state Courts. Justice Thomas noted "What is curious about this case is that the State of New York doesn't seem to be upset about this arrangement."

15. **In Andrew's case, the argument for New York, not federal, jurisdiction seems even more clear.** Using just one deposit in Baltimore where Andrew worked one day a week, the complaint attempted to portray a sophisticated interstate money-laundering scheme. Brady material and new evidence later revealed the innocuous reasons for Mr. Andrew's singular ATM deposit– after meeting with the branch manager, she recommended it was the fastest way to complete the transaction.

16. **The complaint against Andrew relies next on the false assertion that Mr. Andrew did not disclose the escrow account transfers to the school network *after* they were made.** Both Brady material and new evidence demonstrates that he did repeatedly inform the network of the escrow fund challenges before he transferred and consolidated the funds in a new bank account with interest. However, even had Mr. Andrew not informed the school network, the Supreme Court specifically rejected a proposal in *Skilling* v. *United States*, "to construe the statute as encompassing 'undisclosed self-dealing by a public official,' even when he hid financial interests." In truth and in fact, the new evidence demonstrates that Mr. Andrew did not hide his intent to safeguard the escrow funds.

17. **The government made clear that it was because of his political prominence that Andrew was deemed a "worthy target," not because of a reasonable or equitable application of the law or established precedent.** This was not an equal application of the law, it was a specific effort to prosecute Andrew as a member of a political class. The SDNY didn't bother to issue a "target letter," interview Andrew, or even entertain a deferred prosecution agreement before issuing a demonstrably false press release that attempts to highlight his political views. The errors on this release remain uncorrected on the DOJ website to this day.

18. **Unlike in *Ciminelli*, the government and the sentencing Judge both concede that Mr. Andrew's bank transfers were not motivated out of greed or self-enrichment.** The dissolved schools' escrow funds were always safe and earning interest. The victim admits that its network was never deprived of operational funds or financially harmed in any way. At sentencing Judge Cronan stated, "The school (SIC) itself has acknowledged that they didn't suffer any operational harm, and I think it's clear to acknowledge that these are not operational funds. It wasn't as if Seth were taking money and they couldn't make payroll."

19. **The government's only remaining claim of "harm" to the school network seems to be that they were deprived of "*potentially* valuable economic information" regarding the whereabouts of the three orphaned escrow accounts.** Ironically, the FBI complaint indicates that due to mismanagement and compounded fees, two of the three accounts already had insufficient funds according to New York state charter authorizers when the schools were dissolved.

20. **Despite its irrelevance to the charge, the complaint works very hard to try and demonstrate that the funds in question were initially *public funds*, and that Mr. Andrew was well connected having worked in high-levels of government in the past.** This attempt to connect the dissolved school escrow accounts to honest services fraud, while not explicitly stated, underlies the complaint. If Mr. Andrew had never worked in the Obama White House, it is reasonable to assume that the SDNY would never have begun an FBI investigation, let alone brought any charges against Mr. Andrew even though he was a private citizen with no intention of returning to government service. For these reasons, the Court's review of the questions in #21-1158 *Percoco v. United States* which are also expected in June will weigh on Mr. Andrew's appeal brief as well.

21. **When the deputy Solicitor General in *Ciminelli* abandoned the Second Circuit's right-to-control theory, he said "we would be fine with the Court explaining that that's not the right way for the Second Circuit to be going about thinking about these cases."** We strongly agree. All indications are that when Congress wrote the law, they did not mean to equate the often amorphous notion of "control" with "property" as the court ruled in *Blaszczak v United States*. Moreover, we agree with Justice Gorsuch who said in oral arguments in *Ciminelli*, "I do admire the government's concession of error here. Why isn't the proper result here to reverse?"

22. **Even if the Court decides to uphold the convictions in *Ciminelli*, Andrew's case is unique in one important way.** The "victim," has claimed Andrew caused intangible harm, however, the FBI agent's field notes in the Brady material and newly discovered evidence make clear that the escrow accounts were never the school network's funds or property to begin with. Additionally they can't claim that the defendant "fraudulently induced a victim to enter into a transaction."

23. **All parties concede that in mid-March of 2019, communication had broken down and the relationship between the three merged schools, the school network, the civic network, and their boards of trustees was tumultuous.** In newly discovered evidence, it is clear that Andrew attempted to broker a peace between the merged New York Schools and the national network. On or about March 2nd, he called them together for an emergency meeting for what was a "whistleblower" PowerPoint presentation, highlighting financial and academic mismanagement in the national organization. Andrew's attempts at mediation were ignored, and he received no reply to his impolitic follow-up email. In court, this email was held up by the prosecution as evidence of Andrew's anger at the current governance of the organization. Andrew concedes that it was a harsh rebuke; however, whatever the government feels about Andrew's language or tactics, the amicus briefs and filings in *Ciminelli* address this specific question. One reads, "A scheme that deprives a person of information alone may violate a sense of moral uprightness, but It does not establish a scheme or artifice to obtain money or property by means of deception."

24. **Perhaps Justice Kavanaugh best summed up Andrew's need for an adjournment or a stay until after this Supreme Court term when he told the Deputy Solicitor General "You just said it's easier to convict people under this incorrect theory than the proper articulation of the law. That's very problematic."**

25. **In sum, the government's core assertion was that despite being the sole signatory on the accounts Andrew did not have the "right to control" the funds of the dissolved entities, this very question is currently under deliberation by the U.S. Supreme Court.** Andrew felt he had a fiduciary duty and a moral obligation to protect the funds for the mission and the alumni of the dissolved schools. He also felt a sense of legal responsibilities under the schools' bylaws, Charter Authorizer guidelines, and IRS regulations for the proper distribution of remaining assets of dissolved non-profit entities. These are all issues relevant to the Supreme Court's imminent decision in *Ciminelli*, and we hope the Second Circuit grants us the time to expand upon these arguments.

26. **If the adjournment until July 31st, 2023 is granted, in addition to addressing the current session's Supreme Court decisions, Andrew requests the right to extend and revise his brief based on a number of additional arguments including but not limited to:**

- Newly discovered evidence,
- Brady material revelations,
- Black's Legal definitions of "Steal" and "Stole,"
- Guidelines errors, Andrew was in-fact acting on behalf of an educational non profit,
- Incorrect calculations of supposed "loss amount,"
- Ineffective Assistance of Insurance Counsel,
- 6th Amendment, Coy vs. Iowa, and the Accused's right to confront an accuser.
- Van Buren v US (2020) and the Government's assertion regarding email use and access.

WHEREFORE, Appellant respectfully requests that this Honorable Court grant a stay of the deadline for filing an appellate brief pending the outcome of the Supreme Court 2022-2023 Session

Dated: 1/27/23

Respectfully submitted,

/s/ Seth Andrew (pro se)

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

CAPTION:

United States of America

v.

Seth Andrew

**CERTIFICATE OF SERVICE***

Docket Number: 22-1749

I, Seth Andrew (print name), hereby certify under penalty of perjury that on 1/27/2023 (date), I served a copy of Motion Information Statement

Affidavit of Support And Certificate of Service

(list all documents)

by (select all applicable)**

___ Personal Delivery   ___ United States Mail   ___ Federal Express or other Overnight Courier

___ Commercial Carrier   _X_ E-Mail (on consent)

on the following parties:

| Mr Ryan Finkle Esq. | 1 Saint Andrews Plz | New York | NY | 10007-170 |
|---|---|---|---|---|
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |

*A party must serve a copy of each paper on the other parties, or their counsel, to the appeal or proceeding. The Court will reject papers for filing if a certificate of service is not simultaneously filed.

**If different methods of service have been used on different parties, please complete a separate certificate of service for each party.

1/27/2023

Today's Date

s/ Seth Andrew

Signature

Certificate of Service Form (Last Revised 12/2015)