# Appeals Docket: #22-1749
# In the United States Court of Appeals
# For the Second Circuit

United States of America

v.

Seth Andrew

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
0208-1: 1:22-cr-32-1
(The Honorable John Cronan)

Motion by Appellant Seth Andrew to reject the guilty plea and subsequent sentencing because **_the offense conduct to which Mr. Andrew plead guilty charged no crime._**

Motion is based in part on **withheld Brady material and new evidence** provided by the Assistant Solicitor General of the United States during oral arguments in front of the United States Supreme Court on 11/28/22 in

***Ciminelli v. United States of America* (#21-1170)**

***Specifically in regards to the erroneous, extra-legal, unconstitutional, and theoretical "right to control" doctrine on which the government's complaint relied.***

/S/ Seth Andrew (Pro Se)
370 C.P.W
NY, NY 10025
212-865-7617

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**

**JURISDICTIONAL STATEMENT**

**PRELIMINARY STATEMENT**

**QUESTIONS PRESENTED**

**INTRODUCTION**

**STATEMENT OF THE CASE**

**POINT ONE:** THE GOVERNMENT'S RIGHT-TO-CONTROL THEORY WAS DEEPLY FLAWED:

    A. MR. ANDREW'S ROLE AS ESCROW AGENT & DULY AUTHORIZED BANK SIGNATORY GAVE HIM THE EXCLUSIVE "RIGHT- TO-CONTROL" THE FUNDS
    B. DPPS'S ROLE WAS AN INDEPENDENT CONTRACTOR

**POINT TWO:** THE COURT ERRED IN ASSUMING A NEGATIVE NON-ECONOMIC HARM TO THE DISSOLVED SCHOOL ENTITIES

**POINT THREE:** POTENTIALLY EXCULPATORY *BRADY* EVIDENCE AGAINST MR. ANDREW WAS:

    A. INTENTIONALLY WITHHELD,
    B. LEGALLY INSUFFICIENT FOR A COMPLAINT; AND
    C. JURISDICTIONALLY INCORRECT

**CONCLUSION**

(I would like to request a deferred appendix submission, and will update this table of contents, table of authorities, pagination, and footnotes after all briefs are submitted)

## JURISDICTIONAL STATEMENT

Seth Andrew appeals in a timely manner from a sentence entered on July 28, 2022, in the United States District Court for the Southern District of New York (Cronan, J.). The District Court claimed jurisdiction under 18 U.S.C. §3231. This Court has jurisdiction over the District Court's ruling under 28 U.S.C. §1291.

***Mr. Andrew's guilty plea and appellate waiver did not waive his right to challenge the complaint and information, because it charged no offense.[1] Moreover, Mr. Andrew did not waive his right to a Jurisdictional appeal regarding the original complaint and subsequent information.[2]***

## PRELIMINARY STATEMENT

On April 27, 2021 the Southern District of New York, alleged Seth Andrew had committed wire fraud, in violation of 18 U.S.C. §1343. On January 14, 2022 Mr. Andrew pled guilty to one count of wire fraud.

Prior to sentencing Mr. Andrew voluntarily paid $218,005 from personal funds to DPPS (founded as Democracy Builders), the 501(c)3 independent contracting organization he founded to provide support services to public charter schools. He did so despite the fact that the government and Mr. Andrew knew that these monies, plus interest, remained in escrow in the related 501(c)3 entity, Democracy Builders Fund (founded as Alumni Revolution) at the time of his arrest. In addition, before sentencing Mr. Andrew voluntarily paid $22,537 in forfeiture for an alleged mortgage benefit that he did not receive.

DPPS received Mr. Andrew's funds *in addition* to an insurance claim they made. They did so despite the fact that they were made aware in advance that the transfers would be made and that their shared accounting, book-keeping, and auditing firms all knew that the funds were held in escrow by Democracy Builders Fund.

July 28, 2022, Mr. Andrew was sentenced to 366 days imprisonment, a $5,000 fine, and 3 years of supervised release. On September 22, 2022, Mr. Andrew reported to Otisville Federal Correctional Institution.

---

[1] Michener v United States (1948, CA8 Minn) 170 F2d 973, 975.;  Berg v United States (1949, CA9 Cal) 176 F2d 122, 125, cert den 338 US 876, 94 L Ed 537, 70 S Ct 137; Lantz v United States (1969, CA5 Tex) 417 F2d 329; Cantrell v United States (1969, CA8 Mo) 413 F2d 629, cert den 396 US 947, 24 L Ed 2d 251, 90 S Ct 391, reh den 396 US 1031, 24 L Ed 2d 530, 90 S Ct 588;  Brown v Beto (1967, CA5 Tex) 377 F2d 950.

[2] https://www.justice.gov/archives/jm/criminal-resource-manual-626-plea-agreements-and-sentencing-appeal-waivers-discussion-law

## QUESTIONS PRESENTED

**1. Was the Government's case against Mr. Andrew fundamentally about the "right-to-control" funds that (a) the legal signatory *moved* but never, in fact, *stole* from (b) a management entity that was in fact an independent contractor servicing the dissolved school entities in question?**

**2. Did the Court err in wrongfully concluding a non-financial harm?**

**3. Did the Government meet its evidentiary obligations under *Brady*, or did it act in bad faith when it chose to withhold hundreds of pages of *potentially exculpatory* evidence for sixteen months, only releasing them after a plea was negotiated and mere hours before sentencing?**

**4. Did the Southern District of New York have jurisdiction over the case, if the information and complaint charged no offense and the actions and communications cited occurred in New York State?**

**<u>INTRODUCTION</u>**

**As agreed in court, the facts of this case are *exceptional and unprecedented*.**

**The Assistant U.S. Attorney's only argument of law prosecuting Mr. Andrew's supposedly felonious conduct relied exclusively on the dubious and now-discredited, "right to control" theory of federal wire-fraud.**

**Indeed, the criminal complaint against Mr. Andrew cites the issue of "control" thirteen separate times.** The U.S. Supreme Court granted certiorari and heard oral arguments in ***<u>Ciminelli V. United States of America</u>* (#21-1170)** on November 28th, 2022. It appears poised to resoundingly strike down the "right-to-control" theory of wire fraud which seems only to be used when the accused did not deprive a "victim" of money or property. After the oral arguments, to many judges and legal scholars the faulty legal theory used to arrest Mr. Andrew is already considered dead.

**Speaking on behalf of the United States, Deputy Solicitor General Eric Feigin, completely abandoned "right-to-control."** He testified, "we would be fine with the Court explaining that that's not the right way for the Second Circuit to be going about thinking about these cases." Justice Gorsuch posited there was a "radical agreement that the Second Circuit misinterpreted the law" and Justice Sotomayor remained "totally confused" about how the right-to-control theory could ever have been workable in the first place. Justice Gorsuch followed up by saying, "I do admire the government's concession of error here. Why isn't the proper result here to reverse?"

**Moreover, under *Kelly V. US,* the Supreme court ruled 9-0 in 2020 that there could be no crime of wire fraud if the accused did not personally steal money or property.** Both the Government and the sentencing Judge eventually concede that the *intent* of the transactions characterized as criminal in the complaint, was *not* to benefit himself with money or property. They preposterously assert that the transfers were made to cause political "harm" to the governing board of DPPS, the independent contractor to the three dissolved school entities, all of which Mr. Andrew founded.

**All parties agree that Mr. Andrew did *not* receive or spend any of the transferred funds for personal gain.** In fact, the funds in question were always held in escrow and transferred into the account of another non-profit organization, Democracy Builders Fund which served under-privileged youth and, specifically, alumni of the dissolved

schools in question. The Government argued the transfers were prompted by political vengeance and that the charged offense conduct was not driven by money, property, or financial greed. [DEFERRED APPENDIX]

**Additionally, there could be no offense because the governing entities for the schools in question no longer existed; they had in fact been dissolved at the time of the transfers.** DPPS, the "school network" organization mentioned in the complaint, was founded by Andrew in 2005 as Democracy Builders. DPPS remains an *independent contractor[3]* to the quasi-governmental public schools with which it contracts. Both IRS and the NY Charities Bureau regulations expect any remaining assets of dissolved non-profit corporations to be used to benefit the mission of the former entity, which is what Mr. Andrew did.

**Despite the lack of an offense, the *actions* to which the appellant provided an allocution, plea, and testimony under oath remain an honest, accountable, remorseful, and unequivocal account.** Mr. Andrew deeply regrets how this case has caused pain and embarrassment to schools to which he devoted his entire professional life, as well as his family and loved ones. However, that does not make those actions a federal felony, *the complaint charges no offense.*

**The most salient error of law, especially in light of _Ciminelli V. US_, is that the complaint charged no offense under federal law 18 U.S. Code § 1343.** This also means the case was likely not initially heard in the proper jurisdiction. These arguments were not included in Mr. Andrew's appellate waiver in his plea agreement.

**Additionally, the Government failed to meet their affirmative duty to release potentially exculpatory _Brady_ material prior to the plea or the sentencing and furthermore, *new evidence* has arisen after the sentencing was announced.** In the complaint and during the pretrial phase of the case, the government made numerous, and demonstrably faulty, arguments of fact, policy, and regulation. Moreover, their use of the "right-to-control" theory, instead of a property theory of their case, is indicative of their intentionally and unconstitutionally broad reading of Federal law and precedent.

**The Government released hundreds of pages of potentially exculpatory _Brady_ material mere hours before sentencing that could have exonerated Mr. Andrew.**

---

[3] See Democracy Prep Public Schools and the individual schools' IRS 990 forms from 2011 to present.

These documents would have undoubtedly altered the course of the case during the nine months before Mr. Andrew's plea and the additional seven months until sentencing. This strategically nefarious timing meant that the material was not, and could not have been, read and fully processed by the appellant, his counsel, or the judge before the plea **or** sentencing hearings. Indeed, a major consideration for Mr. Andrew's plea was his inability to produce exculpatory documents after the organizations identified in the complaint cut off email, document, and computer access following the news of his arrest.

**The Supreme Court has found that when Congress wrote the federal wire fraud statute in 1952, they intended only to punish property crimes; Congress certainly had no intent of criminalizing political or workplace squabbles though the amorphous notion of depriving a victim a "right-to-control" financial information.** The "victim" statement and the judge's sentencing transcript both make clear that the schools never faced any financial or operational loss, instead the impacts were only perceived to be reputational "harm."

**The improper use of the "right to control" theory is not the only injustice in this case. It is not even the most egregious application of the law. In light of _Ciminelli_, however it should be sufficient for the Second Circuit to dismiss the charge against Mr. Andrew.**

**The appelle requests oral argument to consider any questions that may arise**

## POINT ONE: THE GOVERNMENT'S RIGHT-TO-CONTROL THEORY WAS DEEPLY FLAWED

### A. MR. ANDREW'S ROLE AS ESCROW AGENT AND DULY AUTHORIZED BANK SIGNATORY GAVE HIM THE EXCLUSIVE "RIGHT-TO-CONTROL" THE FUNDS

**The Assistant U.S. Attorney's *argument of law* prosecuting Mr. Andrew relied exclusively on the always-dubious, and now-discredited, *"right to control"* theory of federal wire-fraud in an unreasonably elastic manner.**

While the appellant was incarcerated at Federal Correctional Institution Otisville for one count of wire fraud, the Supreme Court of the United States heard oral arguments in relevant cases, primarily ***Ciminelli v. US (#21-1170)*** which addressed substantially similar matters of law.

On November 28th, 2022, during questioning, Deputy Solicitor General Eric Feigin, speaking on behalf of the United States, completely abandoned the "right-to-control" theory. It appears exceedingly likely that the court will reverse _Ciminelli_ within weeks.

So too should this court with regards to _US v. Andrew._ All federal wire-fraud cases based on the erroneous right-to-control theory do *not* need to be thrown out en masse. However, the essential, singular, and relevant questions of the mis-application of law in _Andrew_ are incontrovertible. The government's overzealous, politically motivated, and error-ridden prosecution of Andrew as a "worthy target" was deeply flawed as a matter of both fact and law.

In _Blaszczak v US_ the Supreme court ruled that in wire-fraud cases Congress did not mean to equate "control" with "property." And yet, the criminal complaint against Andrew cites the issue of "control" thirteen separate times.

Furthermore, even if the "right-to-control" is not struck down in _Ciminelli_, Mr. Andrew's case should still be reversed because it is independently unique and unprecedented. Andrew did not, and could not, deprive DPPS of the "right-to-control" financial information or the specific escrow accounts identified because *the funds were never theirs to control in the first place.* Thus, the complaint charges no offense.

The funds initially belonged to three independent public charter schools Mr. Andrew founded. Mr. Andrew was the Escrow Agent for the dissolution funds. Over the subsequent years, Mr. Andrew remained the sole duly authorized bank signatory, and fiduciarily responsible party for these accounts.  Without any consultation with Andrew as escrow agent or adherence to IRS or NY State Charities Bureau regulations, the school governing boards dissolved the entities. Prior to Mr. Andrew's bank transfers, at the time of their dissolution in 2018 and 2019, there was no longer any legal party to claim economic or non-economic harm of any kind.  In fact, even when DPPS falsely claimed that the funds were theirs to control, they repeatedly conceded that there was no operational harm to DPPS, the students, or the schools.

The egregious mis-interpretation of the law in _Andrew_ is different from any other fraud case. It took the Government 16 months, but they eventually conceded just days before sentencing that Andrew didn't "steal" anything.  The Court acknowledged that Mr. Andrew's actions did not intend to gain, nor did they yield, any personal benefit. The sentencing judge stated, "He did not pocket any of the money that was transferred…He did not spend any of those funds on himself or his family. Mr. Finkel (AUSA) acknowledged he didn't go on vacation, he didn't buy a car…This wasn't a situation, as (Andrew's Counsel) noted, like many defendants convicted of wire fraud, of someone stealing money to line their own wallet."

**There was no actual theft, thus there was no actual offense to be charged.[4]**

The federal fraud statutes criminalize only schemes to defraud, that is, schemes that if completed as intended, would satisfy the common law elements of fraud.  At common law, harm to a traditional property interest was an essential element of fraud.

A mere _risk of fraud_ did not establish harm to a traditional property interest. While the government need not prove that actual harm resulted, it must show that the scheme would have caused harm if completed as the schemers intended. The "victim" and the sentencing judge concur that no property harm ever resulted from Andrew's actions.
See Reply Brief in _Ciminelli_[5]

## B. DPPS ROLE AS AN INDEPENDENT CONTRACTOR

---

[4]

[5] _Ciminelli v. US_ Reply Brief, available at www.SupremeCourt.Gov

DPPS is the "school network" mentioned in the complaint. It was founded by Andrew in 2005, and originally incorporated as Democracy Builders. DPPS was then, and remains to this day an *independent contractor* that contracts with quasi-governmental public charter schools around the nation. It does not, and cannot, "own" any of the schools or their assets. It is contractually bound to provide intellectual property, back-office services, and best-practices developed in large part by Mr. Andrew from 2000-2013.

Incomprehensibly, the government asserts that the board of DPPS, <mark>(DEFERRED APPENDIX)</mark> were denied the "right-to-control" the three schools' escrow funds, despite no evidence being presented to ever support that claim. DPPS was required by New York State law and regulation to maintain arms-length governing relationships with the school boards through separate legal counsel. DPPS operated under a "management agreement" that was re-negotiated regularly to provide intellectual property and back-office support. DPPS never made any attempts to add an alternative escrow agent for the funds or contact Andrew about his status as sole signatory. Before they were "lost" or "found," the escrow funds never appeared on the financial statements or balance sheets of DPPS.

Over multiple years, Andrew repeatedly demonstrated, verbally and in writing, that he intended to preserve the escrow account funds for the benefit of the students and alumni of the three schools. His entreaties fell on deaf ears. His continued whistle-blowing communications, culminated in an early March 2019 joint session with both DPPS leadership, directors, and the school governance boards. In this meeting, he made clear, and no counterclaim was ever asserted, that he remained the founder, superintendent emeritus, sole signatory, and fiduciarily responsible party for these dissolution accounts.

During his plea hearing Andrew orally requested clarity from the Government on the entity to which the Judge was referring to when speaking of the "victim." The government refused to answer with substance, perhaps knowing that they had misled the judge in this matter. <mark>(DEFERRED APPENDIX)</mark> Moreover, the governing entities for whom the dissolution escrow funds were set aside, no longer existed at the time of the transfers. Multiple publicly available documents, financial audits available at the time, as well as newly discovered evidence demonstrated a timeline that support Andrew's claims.

Had they still been incorporated, the Government might have had a colorable argument to claim that the three school entities were the "victims"–but in fact, in 2019 they no longer existed. This lead to substantial confusion during the plea hearing. Thus Mr. Andrew's plea agreement is even more tenuous, so much so that the Judge independently felt the need to raise the interaction at the plea hearing regarding the issue of who might actually be the "victim" during sentencing.

Despite being an independent contractor responsible for overseeing the financial management of the schools, when the school entities dissolved, they orphaned the dormant escrow funds. As escrow agent, Andrew made DPPS aware of this error numerous times, verbally and in writing.

These substantial accounting errors, omissions, and irregularities at DPPS created an existential threat to the academic and financial well being of both the schools and the school network itself. The Government raised this issue in attempt to implicate Andrew in DPPS' own financial failings, however it was Andrew who preserved the $210,000 in three school funds from loss, not DPPS. In fact, it was Andrew who attempted to blow the whistle on these and numerous other challenges in early March, 2019. He specifically cited the orphaned and insufficient escrow funds as one of 20+ financial challenges that DPPS needed to rectify immediately. Only after being ignored did Andrew transfer the escrow funds to Democracy Builders Fund, the 501c3 "civic network" he also founded.

Mr. Andrew documented over a dozen different attempts in writing and verbally to raise his concerns about the schools and network's failing academic and financial health with the governing boards. Those attempts came to a head, when in early March, 2019 Mr. Andrew requested and was granted a special joint session that included members of the governing boards and management of the schools, the school network, and a newly created New York network of schools.

During this two-hour Power-Point whistleblower session, Andrew raised numerous areas of mismanagement, fraud, and waste at the schools and by their independent contractors, including DPPS. It was in this meeting, that Mr. Andrew asserted explicitly and without opposition, that he was the only duly authorized escrow agent for the three orphaned dissolution accounts, and that their loss of the funds was indicative of a

broader pattern of financial neglect and wrongdoing by the school's independent contractors, chiefly DPPS, who failed to successfully manage these funds.

Mr. Andrew made the management and governance boards aware that he hoped they would independently fix most of the accounting and auditing errors over which Andrew no longer had any legal authority. However, he distinguished those from the escrow accounts where he made clear he still did have both the sole remaining signatory control and the fiduciary responsibility to safeguard those funds.

Mr. Andrew received no reply or communication of any kind from the DPPS board chair or leadership after his harshly worded email on March 9th. Thus, a few weeks later when Mr. Andrew was closing out all of the other non-profit, personal, and businesses accounts that he controlled at "Bank one" he moved the escrow funds to "Bank two." His goal was to safeguard the accounts while also receiving better interest rates for the intended beneficiaries, specifically the alumni of the now dissolved school entities.

Andrew was, often uncomfortably, transparent and forthright with those he encountered. For example, he emailed the bank underwriter to specifically indicate that he did NOT own the escrow funds personally. He continued to raise concerns with the schools, management, board, alumni, and regulators about the failed governance of DPPS, the school network to which he had devoted 20 years of his professional life.

It is clear that at the time, Mr. Andrew believed that he alone had the "right-to-control" the escrow funds. By transferring them to a new bank he did not believe he was depriving anyone of money or property nor of their "right to control" anything at all. In furtherance of this fact, Mr. Andrew did not move the third school's escrow funds to a new account until October 2019, only after DPPS had once again orphaned a school's escrow funds.

Why did Mr. Andrew change course after nine months and plead guilty to one count of wire fraud? As he said explicitly in his allocution, Mr. Andrew was accountable for his *actions*. His reputation was destroyed and he felt that a plea would avoid the damage a trial and protracted fight would bring to DPPS students, teachers, schools, and alumni.

Perhaps Justice Kavanaugh summed it up best during oral arguments in <u>*Ciminelli*</u>. He confronted the Deputy Solicitor General with the admonition: **"You just said it's easier**

**to convict people under this incorrect theory than the proper articulation of the law. That's very problematic."**

We concur, and we hope you do too.

## POINT TWO:  THE COURT ERRED IN ASSUMING A NEGATIVE NON-ECONOMIC HARM

At sentencing, the judge erroneously argued that because the dissolved school entities had lost their "right-to-control" these escrow funds, they could have been penalized by the Charter Authorizers.  On the contrary, because of DPPS' failed governance,  "Bank one" indicated that two of the dissolved school accounts were already labeled "dormant," and scheduled to be returned to the Comptroller of the State of New York's "Lost Money Fund" immediately.

Mr. Andrew was told, and has contemporaneous notes verifying such, that if immediate action was not taken to consolidate or transfer the funds to a new account they would be forfeited to the state. This was not an idle threat, public records prove that the DPPS network has "lost" their contracted schools' money" in nearly every  jurisdiction where they have operated.

Adding insult to injury, the government and the sentencing judge both note, but for the wrong reasons, that two of the three account balances had also fallen below the regulatory required threshold of $75,000 per school due to dormancy fees and bank penalties. Without evidence, the government asserted that Andrew may have moved the funds to cause non-economic harm to the schools. However, this was certainly not his motive. It is not how Charter Authorizers/regulators operate and there is no evidence to support any form of this last minute theory advanced by the Government.

After the whistleblower meeting in early March, the relationship between Mr. Andrew, the DPPS Board Chair, and the Interim CEO of DPPS had clearly soured. Mr. Andrew made one final attempt, albeit in an impolitic email, to offer his help for a few months at most. He stated clearly that he would soon be moving abroad with his family and did not want a "job," he wanted the schools to stabilize in a very difficult time.

In court, this unpleasant email was held up by the prosecution as evidence of Mr. Andrew's anger at the current governance of the organization. The Court accepted the Government's non-financial argument for Mr. Andrew's motivations, but erred in assuming that Mr. Andrew was attempting to materially harm the schools he created.

Andrew concedes that his impolitic email was a harsh rebuke of DPPS that was sent at a time of heightened tensions. However, whatever the Government feels about Andrew's language or tactics, the decision in <u>Kelly</u> and the amicus briefs and filings in <u>Ciminelli</u> address this specific question of mere political squabbles. One brief reads, "A scheme that deprives a person of information alone may violate a sense of moral uprightness, but it does not establish a scheme or artifice to obtain money or property by means of deception." Thus, once again, *the complaint charges no offense.*

**POINT THREE:** POTENTIALLY EXCULPATORY ***BRADY*** EVIDENCE
AGAINST MR. ANDREW WAS:

    **A. INTENTIONALLY WITHHELD,**
    **B. LEGALLY INSUFFICIENT FOR A COMPLAINT; AND**
    **C. JURISDICTIONALLY INCORRECT**

**POINT 3A.** In 2019 the Government apparently deemed the appellant a "worthy target." This was because of his age, his race, his political views, his voter-registration efforts, his community leadership, and perhaps most of all, the fact that he was formerly an official serving in the White House of the Obama Administration. These "privileges" of skin color, age, perceived wealth, and school pedigree were cited by both a prosecutor and a Judge. Somehow, these immutable, but not criminal, personal traits were used to justify a years-long federal persecution. The only colorable argument for the investigation into such an insubstantial set of financial transactions was that the media resulting from Mr. Andrew's arrest *might* lead to "general deterrence."

Additionally,the Government did not disclose "potentially exculpatory" ***Brady*** evidence they had in their possession for ~16 months. They chose to maintain the claim of an alleged personal mortgage benefit, despite possessing explicit evidence to the contrary. After the time and massive expense of their investigation and little evidence of criminal or nefarious intent, the Government was forced to resort to the novel and elastic argument that Andrew had deprived DPPS, not of money or property, but of their "right-to-control" information regarding the whereabouts of the funds. The Government intentionally ignored evidence in their possession in order to build the false narrative that Mr. Andrew was motivated out of greed, then "ego," and then finally "political retribution."

The complaint works very hard to try to argue that the funds in question were initially *public funds*, and that Mr. Andrew was politically well-connected having worked in high-levels of government. This attempt to connect the dissolved school escrow accounts to honest services fraud, while not explicitly stated, underlies the complaint. It did not matter that Mr. Andrew was a private citizen with no intention of returning to government service.

If Mr. Andrew had never worked in the Obama White House, it is reasonable to assume that the Department of Justice would never have begun an FBI investigation, let alone

brought any charges against Mr. Andrew. For these reasons, the Court's review of the questions, briefs, and oral arguments in *Percoco v. United States*(#21-1158), also expected within weeks, should weigh favorably on behalf of Mr. Andrew's appeal as well.

Over more than a year of investigation, nine months without an indictment, and a additional seven months post-plea, the Government failed to meet its affirmative duty to release potentially exculpatory *Brady* material. Amazingly, just hours before sentencing, the Government released *hundreds of pages of Brady material* that could have exonerated Mr. Andrew if it had been provided earlier. This strategically nefarious timing meant that the material was not, and could not have been, read and fully processed by the appellant, his counsel, or the judge before the plea *or* sentencing hearings.

These materials clearly met *all* the standards outlined in *Brady v. Maryland, State v. Carr, Kyles v Whitley, Strickler v. Greene*, and *U.S. v. Bagley*. This was not a harmless error; it was a tactical maneuver with the intent to mislead and disadvantage the defense. Specifically:

1. The government's suppression of evidence was clearly favorable to the accused because it was either exculpatory or had a reasonable probability of impeaching the prosecution's arguments, thus undermining the confidence in the outcome of the case.
2. The documents were willingly and intentionally suppressed by the prosecution, including contradictory reports between the FBI field notes and statements repeated in the press releases, initial complaint, information, pre-sentencing report, and plea agreement. (DEFERRED APPENDIX)
3. This action caused material prejudice to arise towards the defendant, his counsel, and the Judge when issuing his sentence because the evidentiary suppression was clearly material.

**POINT 3B:** Perhaps most maddening about the Government's efforts to falsely portray Mr. Andrew as a money-laundering bank fraudster, is that based on *Brady* documents in their possession the FBI and DOJ knew long before drafting the complaint that their evidence was legally insufficient ever to justify an indictment.

The Government had incontrovertible evidence, and knew for more than a year, that Mr. Andrew never intended tangible or intangible harm to DPPS, or to deprive any organization of their property rights. And yet, the Government repeatedly and falsely told the Judge that the dissolution escrow funds were the property of DPPS. The Government twisted the evidence to fit their pre-ordained narrative. They never admitted that the testimony of disgruntled "former employees" who were actually working for an independent contractor, might be predisposed against Mr. Andrew because of their termination from DPPS.

**POINT 3C:** These three schools were all in New York State, and any question of who had a "right to control" the escrow funds is based exclusively on New York State charter school laws.  Without a purported violation of State Law, there could not be a subsequent federal offense.

Unfortunately, the DOJ did not let NewYork State courts handle these novel questions of Public Charter School law. Instead, the Government opted to aggressively deploy the then dubious theory that Mr. Andrew somehow deprived DPPS of their "right-to-control" the choice of Bank to hold the escrow accounts of three dissolved New York State Local Education Authorities, commonly known as school districts.

During oral arguments this session of the US Supreme Court in both _Ciminelli_ and _Percoco_ several Justices expressed significant reservations and wondered aloud why similar cases weren't dealt with in State Courts. In _Percoco_, Justice Thomas noted "What is curious about this case is that the State of New York doesn't seem to be upset about this arrangement."

Furthermore, Mr. Andrew's argument that there should have been no federal jurisdiction of this non-crime, is even more clear than in a case like _Percoco_. The federal government decided to incorrectly interpret New York State Charter School law (DEFERRED APPENDIX) regarding local school districts.  This massive constitutional overreach is a fundamental assault against the notion of federalism, and specifically the Tenth Amendment of the Constitution (APPENDIX).

The federal government's unreasonably broad and elastic definition of a "wire" under a further repudiation of Congress's explicit legislative and original intent. When Congress passed the Wire Fraud Statute in **1952**, they did not, and could not, intend or imagine

that a *federal* crime would be committed by a person who walked a few city blocks from "Bank one" to "Bank two" or who deposited a check into an Automatic Teller Machine (ATM) operated by the same bank.

The Government's complaint against Mr. Andrew fails to reasonably establish federal jurisdiction because they concede that ***he did not personally:***

1) "Devise or intend to devise a scheme or artifice to defraud" DPPS;
2) Obtain any "money or property" from DPPS;
3) Use any "false or fraudulent pretenses" with DPPS; or
4) Use "wire, radio, or television communication in interstate or foreign commerce."

The Government's complaint against Mr. Andrew attempts to create *federal* jurisdiction that is not written, explicitly or implicitly, into the legislative intent of Congress. Mr. Andrew did not "wire" any funds. He did use email, specifically Gmail which had servers in other states, to honestly communicate with bankers. However, neither Congress in 1952 nor Mr. Andrew in 2019 could be reasonably expected to know where Gmail, or the bank maintained servers, or which of the billion permutations of routers, switches, fiber-optic cables, cell-phone towers, and global satellites might transmit his innocuous communications.

Mr. Andrew's movement of funds from "Bank one" to "Bank two" was not nefariously transferred using a telegraph in a sophisticated interstate money-laundering scheme. Three paper checks were deposited into a new bank. The fact that Andrew worked one day a week in Baltimore, was not part of a felonious federal scheme or artifice to defraud DPPS, the banks, or anyone else.

*Brady* material and *new evidence* later revealed the innocuous reasons for Mr. Andrew's singular ATM deposit– after meeting with the branch manager, she recommended it was the fastest way to complete the transaction. A February, 2023 visit to Citizens Bank in New York to open a new account in the same manner and deposit a paper check led to the same result as in 2019. The Bank official suggested that depositing the check in the ATM was the best and safest means to have it posted to the account.

## **CONCLUSION**

The appellant provided an allocution and plea that remains honest, accountable, remorseful, and unequivocal. However, his conduct should never, and especially after *Ciminelli,* have been charged because ***the complaint charged no offense.***

The Government's charging documents alleged that Mr. Andrew fraudulently denied DPPS the "right-to-control" escrow funds. While the funds were not in fact theirs to control, even had they been denied knowledge of the funds' whereabouts, no such "right" exists under federal law. The "right-to-control" theory of federal Wire Fraud has been abandoned by the US Government, and so should the case against Mr. Andrew. He may have been a "worthy target," in the Government's eyes, but only because he was a lifelong public servant who has already suffered irreparable harm. Mr. Andrew stole no funds, so once again, ***the complaint charged no offense.***

US Supreme Court decisions in *Cleveland v. US* found that in order to violate the wire fraud laws, mere "deception or deceit" was insufficient–the object of the scheme had to aim to explicitly **personally obtain money or property.** That finding was further upheld in 2020 with the resounding 9-0 decision in *Kelly v. US* which found that money or property must in fact be *taken* to constitute a federal case of wire fraud. So even if the Government didn't like the tone of Mr. Andrew's emails, ***the complaint charged no offense.***

According to definitions in *Black's Law Dictionary*, Mr. Andrew never "took," "stole," "embezzled," or even "misappropriated" funds. While Mr. Andrew did indeed use his fiduciary authority as escrow agent to move funds from one bank to another, those funds always remained in the control of an affiliated non-profit of the three dissolved school entities. The government concedes no *money or property* was taken, and thus again, ***the complaint charged no offense.***

The governing board and leadership of DPPS, an independent contractor to the three schools, had been repeatedly informed of their financial errors. Mr. Andrew's own whistleblowing about the orphaned escrow accounts did not justify the Government's investigation, if anything they warranted a commendation. The Judge asserts in sentencing that Mr. Andrew's transfers were not motivated out of greed, but out of some

form of political retribution. However, in *Skilling* v. *US,* the Supreme Court specifically rejected a proposal "to construe the (wire fraud) statute as encompassing 'undisclosed self-dealing' …even when he hid financial interests." Thus, even if the alleged attempt to harm the DPPS board by moving funds went undisclosed, ***the complaint charged no offense.***

However, in truth and in fact, new evidence demonstrates that Mr. Andrew never hid his intent to safeguard the escrow funds, either before or after the transfer. He disclosed their whereabouts to multiple parties over multiple months. Indeed, the accounting firm used by DPPS was at that time the same firm that also handled the audits for Democracy Builders Fund, the affiliated not-for-profit that was holding the escrow. The dissolved school entity funds were always earning interest and clearly labeled as escrow for the previously dissolved school entities, thus there was never any economic harm and thus, ***the complaint charged no offense.***

Even the purported "victim," never claimed to be deprived of operational funds or financially harmed in any way. At sentencing Judge Cronan stated, "The school (Sic) itself has acknowledged that they didn't suffer any operational harm, and I think it's clear to acknowledge that these are not operational funds. It wasn't as if Seth were taking money and they couldn't make payroll." Without non-economic or operational harm to any victim it's again clear, ***the complaint charged no offense.***

At 6am on April 27th, 2021, the DOJ sent out an error-filled press release. At that moment, they effectively ended Mr. Andrew's professional career in education and government. Following the Deputy Solicitor General's testimony to the US Supreme Court and the strong likelihood that they reverse ***Ciminelli***, it is fully within the power of the Second Circuit to rectify at least part of the injustice for Mr. Andrew. We ask that you reject the wire fraud plea in ***US v. Andrew*** based on the misguided "right-to-control" theory presented by the "sovereign district of New York." Mr. Andrew should not be further punished for the Government's faulty decision to draft and prosecute ***a complaint that charged no offense.***