UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

## MOTION INFORMATION STATEMENT

Docket Number(s): 22-1749 _____     _____ Caption [use short title] _____

Motion for: to dismiss appeal

_____

_____

Set forth below precise, complete statement of relief sought:

The United States moves to dismiss the defendant's appeal.

United States of America v. Andrew

MOVING PARTY: United States of America                   OPPOSING PARTY: Seth Andrew

☐ Plaintiff          ☐ Defendant

☐ Appellant/Petitioner     ☑ Appellee/Respondent

MOVING ATTORNEY: Damian Williams, U.S. Attorney, Southern District of New York   OPPOSING ATTORNEY: Seth Andrew (pro se)

[name of attorney, with firm, address, phone number and e-mail]

By: Ryan B. Finkel, Assistant U.S. Attorney          370 Central Park West

One Saint Andrew's Plaza, New York, NY 10007          New York, NY 10025

(212) 637-6612; Email: Ryan.Finkel@usdoj.gov          212-865-7617

Court- Judge/ Agency appealed from: The Honorable John P. Cronan, United States District Judge, Southern District of New York

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☐ Yes ☑ No (explain): defendant is pro se

_____

Opposing counsel's position on motion:
☐ Unopposed ☐ Opposed ☑ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?          ☐ Yes ☐ No
Has this relief been previously sought in this court?     ☐ Yes ☐ No
Requested return date and explanation of emergency: _____

_____

_____

_____

Is oral argument on motion requested?  ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No If yes, enter date: _____

Signature of Moving Attorney:

/s/ Ryan B. Finkel _____ Date: 5-16-23 _____ Service by: ☑ CM/ECF  ☐ Other [Attach proof of service]

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. 22-1749 |
| | : | |
| Appellee, | : | **AFFIRMATION IN** |
| | : | **SUPPORT OF** |
| - v. - | : | **MOTION TO DISMISS** |
| | : | **APPEAL** |
| SETH ANDREW, also known as Sealed Defendant 1, | : | |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK          )
COUNTY OF NEW YORK      :   ss.:
SOUTHERN DISTRICT OF NEW YORK  )

RYAN FINKEL, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury:

1.    I am an Assistant United States Attorney in the Office of Damian Williams, United States Attorney for the Southern District of New York, and I represent the Government in this appeal. I submit this affirmation in support of the Government's motion to dismiss this appeal brought by defendant-appellant Seth Andrew based on Andrew's knowing and voluntary waiver of his appellate rights in this case.

1

## PRELIMINARY STATEMENT

2.     Seth Andrew appeals from a judgment of conviction entered on July 29, 2022, in the United States District Court for the Southern District of New York, by the Honorable John P. Cronan, United States District Judge, following Andrew's guilty plea.

3.     On January 14, 2022, Information 22 Cr. 32 (JPC) (the "Information") was filed, charging Andrew with a single count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

4.     That same day, Andrew pled guilty before Judge Cronan to the sole count of the Information pursuant to a plea agreement with the Government.

5.     On July 28, 2022, Judge Cronan sentenced Andrew principally to 366 days' imprisonment.  Judgment was entered the next day.

6.     On August 11, 2022, Andrew filed a notice of appeal.

7.     Andrew completed his term of incarceration at a halfway house and, according to the Bureau of Prisons website, was released on May 15, 2023.

## STATEMENT OF FACTS

**A.     The Offense Conduct**

8.     Democracy Prep Public Schools ("DPPS" or "Democracy Prep") is a series of charter schools based in New York City that focuses on providing

educational opportunities to underserved communities. (*See* PSR ¶ 9).[1] Andrew founded the first Democracy Prep school in 2005, becoming its superintendent and thereafter the *de facto* leader over all of DPPS. In October 2012, Andrew announced he was leaving Democracy Prep to begin work promoting another non-profit, Democracy Builders. (PSR ¶ 13). The formal relationship between Andrew and Democracy Prep officially ceased on in January 2017. Andrew's Democracy Prep email account was left active only so that Andrew could have any emails sent to him at that address forwarded to his Democracy Builders account. (PSR ¶ 20).

9. The New York State Board of Regents requires charter schools to maintain an escrow account of at least approximately $75,000 that can be accessed only for certain reasons, such as to cover expenses should the school dissolve. (PSR ¶ 22). Failure to maintain an escrow account could threaten a charter school's status as a school authorized by the Board of Regents. Indeed, as the agreement between a Democracy Prep charter school and the Board of Regents made clear, failure to maintain the escrow account is considered a "material" violation of the charter agreement. (*Id.*). Having been the signatory of that charter school's Board

---

[1] "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with Andrew's sentencing; "Dkt." refers to an entry on the District Court's docket in this case; and "Br." refers to Andrew's brief on appeal. Unless otherwise noted, quotations omit internal quotation marks, citations, footnotes, and previous alterations.

3

of Regents agreement, Andrew was aware of the importance of the escrow accounts. (*See id.*).

10.     On March 5, 2009, March 8, 2011, and March 26, 2013, Democracy Prep opened escrow accounts for "Democracy Preparatory Charter School," "Democracy Preparatory Harlem Charter School," and "Democracy Preparatory Endurance Charter School," respectively.  (*See* PSR ¶¶ 22-26).  Andrew was identified in the opening paperwork for each of those three accounts.  (*Id.*).  The funding for the escrow accounts was provided by the public—specifically, the New York City Department of Education.  (PSR ¶ 27).  As explained above, these accounts were established pursuant to the Board of Regents charter school requirements.  They were essential to ensure each of the schools fulfilled its charter agreement obligations and, according to Democracy Prep former executives, were "not to be touched at all."  (*Id.*).

11.     On March 28, 2019, Andrew walked into a particular bank ("Bank-1") in Manhattan, and, without authorization from anyone, closed two of Democracy Prep's escrow accounts.  (PSR ¶¶ 28-29).  Andrew was able to do this because he was named on the escrow accounts paperwork as an authorized signatory for the accounts, as a result of his earlier work with the schools.  The bank provided him two checks representing the liquidated escrow accounts—one made out to "Democracy Preparatory Charter School" in the amount of $71,870.60 and a second

check made out to "Democracy Preparatory Harlem Charter" in the amount of $70,642.98. (*Id*.). This theft came just 18 days after Andrew sent an acrimonious email to Democracy Prep's Board outlining terms under which he wanted Democracy Prep to rehire him. (Dkt. 43, Ex. B). Democracy prep declined the offer.

12. The same day that he closed those two escrow accounts, Andrew traveled to a different bank ("Bank-2") in Manhattan and opened a bank account in the name of "Democracy Preparatory Charter School" ("Fraud Account-1") and associated that account with the address of Democracy Builders. (PSR ¶¶ 30-31). To falsely demonstrate to Bank-2 that Andrew was an executive of "Democracy Preparatory Charter School," Andrew forwarded an email from his Democracy Prep email account to a Bank-2 employee ("Employee-1"), who opened the bank account for Andrew. That email contained Democracy Preparatory Charter School bylaws, certificate of incorporation, registration statement and a document from the IRS. (PSR ¶¶ 32-33). The provision of those materials satisfied Employee-1 that Andrew was, as he had claimed, the "Key Executive with Control of the Entity," namely "Democracy Preparatory Charter School." (PSR ¶¶ 31, 34). Andrew deposited into Fraud Account-1 the check for $71,881.23 made out to Democracy Prep Charter School. Andrew did not deposit the second check he obtained earlier that day, which was in the name of "Democracy Preparatory Harlem Charter." Andrew later deposited the second check at an ATM in Baltimore. (PSR ¶ 37).

5

13.     Approximately six months later, on October 17, 2019, Andrew returned to a Bank-1 branch and, without receiving authorization from anyone, closed out a third Democracy Prep escrow account.  (PSR ¶ 38).  Again, Andrew was able to do this because he was named as a signatory in the account's opening documentation. Upon closing the account, Bank-1 provided Andrew a check made out to "Democracy Preparatory Endurance" in the amount of $75,481.10.   (*Id.*).  Bank-1 surveillance footage captured Andrew closing the account at the teller's desk.

14.     On October 21, 2019, Andrew opened a bank account at a different bank ("Bank-3") in the name of "Democracy Builders Fund Inc." ("Fraud Account-2")—the non-profit entity under his control.  (PSR ¶ 39).  That same day, Andrew deposited into the "Democracy Builders Fund Inc." account the $75,481.10 check representing the stolen escrow funds from "Democracy Preparatory Endurance." (*Id.*).

15.     On November 19, 2019, Andrew closed the account he opened at Bank-2 and obtained a check in the amount of $144,473.29 made out to Democracy Prep Charter School, which represented the stolen escrow funds from the first two Democracy Prep schools.  (PSR ¶ 40).  Andrew attempted to deposit that check into Fraud Account-2 but was unable to do so because Fraud Account-2 was in the name of Democracy Builders Fund.  To solve this problem, Andrew returned to Bank-2 and obtained a new check, which was made payable to "Democracy Builders Fund

Inc." (*Id.*). On November 19, 2019, Andrew successfully deposited this new check into Fraud Account-2.

16.    The next day, Andrew transferred the proceeds from the "Democracy Builders Fund Inc." account—approximately $210,000—into a CD held by Bank-3. That CD matured on May 20, 2020 and earned an additional $2,083.52 in interest. (Dkt. 43 at 5). That same day, Andrew transferred the proceeds of the matured CD— *i.e.* the proceeds of the stolen escrow funds—to a Democracy Builders operating account. (*Id.*). On May 21, 2020, the Democracy Builders operating account sent a $225,000 wire which was a deposit toward property Democracy Builders purchased in Vermont. (*Id.*). Though the operating account had sufficient assets to otherwise cover the $225,000 deposit, including proceeds from a PPP loan, the timing of the transfers indicates the stolen funds were used by Andrew to fund this down payment. (*Id.*).

## B.    The Arrest and Plea Discussions

17.    Andrew was arrested on April 27, 2021, pursuant to a criminal complaint, which charged him with wire fraud, money laundering, and making false statements to a bank.

18.    Over the next several months, the Government and Andrew's retained counsel engaged in plea discussions concerning a potential disposition. The Government brought to the attention of Andrew's counsel other financial

7

irregularities in which Andrew was thought to be involved. Andrew's counsel provided the Government information about those activities.

19.    Ultimately the parties reached a disposition. Andrew would plead guilty to a single count of wire fraud rather than be subject to a charge of money laundering, which would expose Andrew to a higher Guidelines range. Further, the Government agreed to settle its forfeiture claim with Andrew. Although the Government was entitled to seek $240,542.57 in forfeiture, the Government agreed that it would accept $22,537.47 in full satisfaction of the forfeiture judgement provided Andrew paid that amount as well as the full restitution amount before sentencing. In short, the parties' discussions resulted in a substantial bargain for Andrew, who avoided a higher Guidelines range and a larger forfeiture obligation.

## C.    The Plea Agreement and Guilty Plea

20.    On January 14, 2022, Andrew pled guilty, pursuant to a written plea agreement with the Government, to Count One of the Information. (Ex. A (Plea Agreement); Dkt. 30 (plea transcript)).

21.    In the Plea Agreement, Andrew and the Government calculated the applicable United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range as follows: Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven. Pursuant to U.S.S.G. § 2B1.1(b)(1)(F), the offense level is increased by 10 levels because the actual or intended loss amount exceeded $150,000 but was not greater

8

than $250,000. Pursuant to U.S.S.G. § 2B1.1(b)(9), the offense level is increased by two levels because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency. Pursuant to U.S.S.G. § 3E1.1, three levels were subtracted for acceptance of responsibility, resulting in a total offense level of 16. The defendant had zero criminal history points, resulting in a Criminal History Category of I; as a result, the Stipulated Guidelines Range was 21 to 27 months' imprisonment. The parties also stipulated that the applicable fine range under the Guidelines was $10,000 to $95,000. (Ex. A at 2-3).

22.     In addition, the parties agreed "that neither a downward nor an upward departure from the Stipulated Guidelines Range" was warranted. (Ex. A at 3). They also agreed that neither would "seek any departure or adjustment pursuant to the Guidelines" that was not stated in the Plea Agreement and would not "in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines." (*Id.*). The parties agreed, however, that "either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)," and that "nothing in this Agreement limits the right of the parties . . . to present to the Probation Office or the Court any facts relevant to sentencing." (*Id.*).

23.     Andrew also agreed that he would not "file a direct appeal; nor bring a collateral challenge . . . of any sentence within or below the Stipulated Guidelines Range of 21 to 27 months' imprisonment . . . ." (Ex. A at 4). Andrew further agreed not to "appeal any term of supervised release that is less than or equal to the statutory maximum," "any fine that is less than or equal to $95,000," or "any special assessment that is less than or equal to $100." (*Id.*).

24.     Andrew further agreed that he "waive[d] any and all right to withdraw his plea or to attack his conviction, either on direct appeal, or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement." (Ex. A at 4-5).

25.     At the outset of the plea proceeding, Andrew was placed under oath, and Judge Cronan established that he was competent to proceed.  (Dkt. 30 at 7-10). Judge Cronan then confirmed that Andrew understood he had a right to be indicted by a grand jury, that he was waiving that right, and consented to the filing of the Information in this case.  (Dkt. 30 at 10-13).  Judge Cronan confirmed that Andrew

signed the waiver of Indictment form, had read the Information, and understood the charge it contained.  (Dkt. 30 at 10-13).

26.     The Information described Andrew's scheme in the following manner: "ANDREW stole approximately $218,005 belonging to charter schools, and in connection therewith and in furtherance thereof, ANDREW transmitted and caused to be transmitted over interstate wires emails necessary to implement his scheme, including emails transmitted through the Southern District of New York."  (Dkt. 26 at 1-2).

27.     Judge Cronan ensured that Andrew knew the elements of the charge to which he was to plead guilty.  (Dkt. 30 at 19-20).   Judge Cronan advised Andrew of the penalties he faced as a result of his guilty plea.  (Dkt. 30 at 21-22).  Judge Cronan also confirmed that Andrew understood the rights he was giving up by pleading guilty, which included: (i) the right to a jury trial where he would be presumed innocent unless the Government met its burden of proving his guilt beyond a reasonable doubt; (ii) the right to be represented by counsel, including appointed counsel, at trial and at every other stage of the proceeding; (iii) the right to testify, confront, and question witnesses testifying against him; and (iv) the right against self-incrimination.  (Dkt. 30 at 15-16).  Judge Cronan also confirmed that Andrew understood that his answers given under oath could be used against him in a

prosecution for perjury or false statements if he did not tell the truth. (Dkt. 30 at 7). Judge Cronan confirmed no one forced Andrew to plead guilty. (Dkt. 30 at 32).

28.     Judge Cronan confirmed that there was a factual basis for the plea. (Dkt. 30 at 32). During his allocution, Andrew stated:

> In March, April, and October of 2019, I transferred funds from three dissolution accounts associated with the Democracy Prep network to other bank accounts that I opened. I ultimately transferred those funds into the account of another nonprofit, Democracy Builders Fund. I transferred the funds to the Democracy Builders Fund without the written authorization of DPPS. I sent emails in order to facilitate the account opening and transfer of funds. I represented to bank employees that I was authorized to transfer these funds. I'm truly sorry for what I have done.

(Dkt. 30 at 32-33).

29.     Andrew then confirmed that when he "represented that [he] had authorization to bank officials to transfer the funds, [he knew] that [he] did not, in fact, have that authorization." (Dkt. 30 at 36). In addition, the Government described the evidence against Andrew that it would offer at trial. (Dkt. 30 at 36).

30.     Andrew also stated that he had reviewed the Plea Agreement with his attorney and that he understood its terms. (Dkt. 30 at 29). Andrew confirmed that he was aware that the Plea Agreement contained an analysis of how the Sentencing Guidelines might apply to his case, and of the appellate waiver, which restricted his ability to appeal from, or collaterally attack, his sentence. (Dkt. 30 at 29-30).

Specifically, Andrew acknowledged that he agreed not to appeal or collaterally challenge any term of imprisonment less than or equal to 27 months, any fine less than or equal to $95,000, any restitution less than or equal to $218,005, and any forfeiture less than or equal to $240,542.47. (Dkt. 30 at 30-31). Andrew also confirmed that there were no agreements or understandings related to his guilty plea other than those in the Plea Agreement. (Dkt. 30 at 31).

31. Judge Cronan stated that he was satisfied that Andrew understood the consequences of a plea of guilty and was knowingly and voluntarily pleading guilty. (Dkt. 30 at 37-38).

**D. Disclosures by the Government**

32. Following Andrew's guilty plea, the Government made several disclosures to Andrew's counsel. First, on March 11, 2022, the Government disclosed a statement made by a member of DPPS's board regarding that board member's view of Andrew's work for DPPS because that statement could be construed as mitigating. Second, on April 8, 2022, the Government responded to defense counsel's inquires about that aforementioned statement.

33. Third, on July 20, 2022, the Government provided a disclosure about an inconsistency between an FBI agent's final 302 memorandum, and contemporaneous draft notes, memorializing an interview with a Bank-2 employee concerning whether Andrew received a mortgage interest discount and another

13

promotional interest rate when Andrew opened accounts at Bank-2. That same day, the Government also produced certain records of accounts Andrew opened at Bank-2 as well as his mortgage application on file with Bank-2. Ultimately, Andrew received the mortgage interest discount but did not receive the promotional interest rate.

## E.    The Sentencing Proceeding

34.    In advance of Andrew's sentencing, the Probation Office prepared a Presentence Report. Consistent with the Plea Agreement, the Probation Office determined that Andrew's sentencing range was 21 to 27 months' imprisonment. (PSR ¶ 130). The defense did not submit any objections to the Guidelines calculation in the Presentence Report. (PSR at 30-34). The Probation Office recommended a sentence of 366 days' imprisonment. (PSR at 36).

35.    In his sentencing submissions, Andrew sought a sentence of home confinement, arguing, *inter alia*, that his past good deeds, history and characteristics, and acceptance of responsibility warranted a non-incarceratory sentence. (Dkt. 42; *see* Dkt. 45). The Government sought a sentence at the low end of the Guidelines range of 21 to 27 months' imprisonment. (Dkt. 43). The Government emphasized that Andrew's offense conduct was serious in that—on two occasions—he stole a total of $218,005 from "those who once trusted and relied on him." (Dkt. 43 at 1). The Government also noted that Andrew's motive was to intentionally harm the

14

victim because he was displeased the victim no longer wished to employ him. (Dkt. 43 at 11). The Government further noted that deterrence counseled in favor of a sentence at the low end of the Guidelines range because "others similarly situated should also understand that theft of $218,000 is an extraordinarily serious action especially where, as is the case here, it involved multiple acts over the course of several months and was motivated by a desire to punish an innocent non-profit organization." (Dkt. 43 at 12).

36. On July 28, 2022, Andrew appeared before Judge Cronan for sentencing. Judge Cronan first confirmed that he had received and reviewed the Presentence Report and the parties' submissions. (Dkt. 51 at 3-5). Judge Cronan then confirmed that Andrew had reviewed the Presentence Report and discussed it with his attorney. (Dkt. 51 at 7). Defense counsel noted that while they had previously made some objections they did "not intend to maintain those objections before the Court." (Dkt. 51 at 8). The District Court adopted the factual recitations in the Presentence Report and noted that the aforementioned objections generally were "interpretations of facts, and not the facts themselves." (Dkt. 51 at 8).

37. Defense counsel and Government counsel each gave lengthy remarks about an appropriate sentence. Defense counsel emphasized Andrew's history and characteristics, his work in public service, and acceptance of responsibility.

15

38.     Andrew spoke at sentencing.  Andrew stated his "actions caused harm to Democracy Prep public schools in ways that I deeply regret."  (Dkt. 51 at 34).  Andrew continued that he was "solely accountable for the decision to transfer the funds the government identified."  (*Id*.).

39.     After hearing from the parties, Judge Cronan considered the factors set forth in 18 U.S.C. § 3553(a).  Judge Cronan noted that while Andrew's actions may not have been focused on enriching himself "his actions were targeted at a specific victim, and there was in fact harm caused to that victim" and the offense conduct was "a very intentional and deliberate act against Democracy Prep."  (Dkt. 51 at 38, 41).  Judge Cronan noted the crime involved "a series of transactions that spanned over a year" and those transactions "were intended, at least in part, to conceal" the source of the funds.  (Dkt. 51 at 40).  Judge Cronan further considered that there is a need for "some degree" of specific deterrence as well as general deterrence toward "those who might be tempted to abuse a position of trust."  (Dkt. 51 at 44).  The District Court further considered Andrew's history and characteristics, noting that Andrew held "many prominent jobs" and that Andrew tried to "make a positive impact in the area of civic education."  (Dkt. 51 at 45).  Judge Cronan referenced the "good" Andrew performed in his life and recited excerpts of letters submitted by individuals in support of mitigation.  (Dkt. 51 at 47-48).

16

40.     In light of those factors, Judge Cronan found that a below-Guidelines sentence of 366 days' imprisonment was sufficient, but not greater than necessary, to serve the purposes of sentencing.  (Dkt. 51 at 47-49).  The District Court imposed three years of supervised release, $218,005 restitution (which the court noted was satisfied), $22,537.47 forfeiture (which the court noted was paid), a $5,000 fine, and a mandatory $100 special assessment.  (Dkt. 51 at 49-51).

### E.     The Appeal

41.     Judgment was entered on July 29, 2022.  (Dkt. 49).  On August 11, 2022, Andrew filed a notice of appeal.  (Dkt. 50).

42.     On appeal, Andrew makes three arguments: (1) that his wire-fraud conviction was premised on an improper right-to-control theory; (2) that the District Court incorrectly considered at sentencing a non-economic harm to the victim; and (3) that the Government withheld *Brady* material.

### ARGUMENT

### I.     Andrew's Unconditional Guilty Plea Waived His "No Offense" Claim

### A.     Applicable Law

43.     A defendant who knowingly and voluntarily enters a guilty plea waives all non-jurisdictional defects in the prior proceedings. *See United States v. Hsu*, 669 F.3d 112, 117-18 (2d Cir. 2012); *United States v. Lasaga*, 328 F.3d 61, 63 (2d Cir. 2003); *see also* Fed. R. Crim. P. 11 advisory committee's notes ("[T]he availability

17

of a conditional plea under specified circumstances will aid in clarifying the fact that traditional, unqualified pleas do constitute a waiver of nonjurisdictional defects."). In this context, a jurisdictional defect pertains to "the court's power to entertain the prosecution." *Hayle v. United States*, 815 F.2d 879, 882 (2d Cir. 1987); *see United States v. Cotton*, 535 U.S. 625, 630 (2002) (unwaivable jurisdictional challenge "involves a court's power to hear a case"). The Supreme Court has recently clarified that an unconditional plea does not waive challenges to the constitutionality of the statute of conviction, since such challenges also "call into question the Government's power to 'constitutionally prosecute'" a defendant. *Class v. United States*, 138 S. Ct. 798, 805 (2018) (quoting *United States v. Broce*, 488 U.S. 563, 575 (1989)) (further internal quotation marks omitted).

44.     Section 3231 of Title 18 grants "original jurisdiction . . . of all offenses against the laws of the United States" to the district courts. 18 U.S.C. § 3231. Charging such an offense "requires no more than charging the violation of a specific statute." *United States v. Yousef*, 750 F.3d 254, 259 n.3 (2d Cir. 2014); *see also United States v. George*, 676 F.3d 249, 259 (1st Cir. 2012) ("[I]f an indictment or information alleges the violation of a crime set out in Title 18 or in one of the other statutes defining federal crimes, that is the end of the jurisdictional inquiry." (internal quotation marks omitted)); *United States v. Jacquez-Beltran*, 326 F.3d 661, 662 n.1 (5th Cir. 2003) ("To confer subject matter jurisdiction upon a federal court, an

18

indictment need only charge a defendant with an offense against the United States in language similar to that used by the relevant statute."). Accordingly, this Court has held that "to sustain a challenge to the district court's jurisdiction, the defendant who has pleaded guilty must establish that the face of the indictment discloses that the count or counts to which he pleaded guilty failed to charge a federal offense." *Hayle*, 815 F.2d at 881.

45. The "inquiry into whether an indictment charges a federal offense for the purposes of establishing subject matter jurisdiction under § 3231 is exceedingly narrow." *Yousef*, 750 F.3d at 259. The only question is whether "the indictment alleges all of the statutory elements of a federal offense." *Id.*; *see United States v. Rubin*, 743 F.3d 31, 38 (2d Cir. 2014) ("In order to invoke a district court's jurisdiction, an indictment need only allege that a defendant committed a federal criminal offense at a stated time and place in terms plainly tracking the language of the relevant statute."); *United States v. Frias*, 521 F.3d 229, 235-36 (2d Cir. 2008) (holding that an indictment that "plainly tracks the language of the statute and states the time and place of the alleged [crime]" is "sufficient to invoke the district court's jurisdiction"); *see also Jacquez-Beltran*, 326 F.3d at 662 n.1; *United States v. González*, 311 F.3d 440, 442 (1st Cir. 2002) ("[A] federal criminal case is within the subject matter jurisdiction of the district court if the indictment charges . . . that the defendant committed a crime described in Title 18 or in one of the other statutes

19

defining federal crimes."). The Supreme Court has stated unequivocally that "defects in an indictment do not deprive a court of its power to adjudicate a case." *Cotton*, 535 U.S. at 630. "When such jurisdiction is established, a district court has authority to decide all other issues presented within the framework of the case, including whether to accept a guilty plea." *Rubin*, 743 F.3d at 39.

46.     Thus, "[e]ven a defendant's persuasive argument that the conduct set out in the indictment does not make out a violation of the charged statute does not implicate subject-matter jurisdiction." *Yousef*, 750 F.3d at 260. Accordingly, a defendant's claim that an indictment or information charges a "non-offense" is not a claim of "jurisdictional" deficiency sufficient to survive the waiver rule set forth above. *Rubin*, 743 F.3d at 37 ("[Challenges to indictments on the basis that the alleged conduct does not constitute an offense under the charged statute are also non-jurisdictional challenges."); *see id.* ("[T]he precedents of the Supreme Court make clear that a district court has 'jurisdiction' even where an indictment alleges conduct that does not state an offense under the statute purportedly violated."); *Cotton*, 535 U.S. at 630-31 ("[A] district court 'has jurisdiction of all crimes cognizable under the authority of the United States . . . [and][t]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case.'" (quoting *Lamar v. United States*, 240 U.S. 60, 65 (1916)) (alterations in original).

**B.    Discussion**

47.    By unconditionally pleading guilty, and admitting under oath that he was guilty of wire fraud as charged in Count One of the Information, Andrew waived any claim that the Information did not allege a federal offense. *See Rubin*, 743 F.3d at 38. The Information, on its face, alleged a violation of federal law, set forth the statutory elements of the offense, and plainly tracked the language of the relevant statute. *See id.*; *Yousef*, 750 F.3d at 259. The Information therefore properly invoked the District Court's jurisdiction, and any claim that it failed to allege a federal offense was waived by Andrew's unconditional guilty plea.

48.    The Supreme Court's decision in *Lamar* is instructive. There, the defendant was charged with "having falsely pretended to be an officer of the government of the United States." *Lamar*, 240 U.S. at 64. The defendant argued, however, that as a member of the House of Representatives, he was not an "officer" of the United States, and that "the [district] court had no jurisdiction because the indictment does not charge a crime against the United States." *Id.* The Supreme Court, noting that "[j]urisdiction is a matter of power, and covers wrong as well as right decisions," concluded that "[t]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case," and not to jurisdiction. *Id.* at 64-65. Just as in *Lamar*, Andrew's claim—that the Government charged an offense under a "right to control" theory or, in the alternative, "no

21

offense" because Andrew's case "is independently unique and unprecedented" (Br. at 8)—goes to the merits of this case, not the jurisdiction of the District Court to hear it. *See Cotton*, 535 U.S. at 630. Thus, because Andrew's claim is not jurisdictional, it was waived. *See Rubin*, 743 F.3d at 37.

49.     Nothing about the Supreme Court's decision in *Class* changes that result. In *Class*, the defendant had pleaded guilty to possessing firearms in his locked jeep, in violation of 40 U.S.C. § 5104(e)(1). *See* 138 S. Ct. at 802. On appeal, the defendant argued that the statute was unconstitutional, specifically that it violated his Second Amendment and Due Process rights. *See id.* The Supreme Court held that the defendant "did not relinquish his right to appeal the District Court's constitutional determinations," *id.* at 803, because his claims "challenge the Government's power to criminalize Class' (admitted) conduct," and "thereby call into question the Government's power to constitutionally prosecute him," *id.* at 805 (internal quotation marks omitted).

50.     Thus, the holding of *Class* was that a guilty plea does not waive a challenge to the constitutionality of the statute of conviction. *E.g.*, *United States v. Smith*, 945 F.3d 729, 734 n.6 (2d Cir. 2019); *United States v. Lloyd*, 901 F.3d 111, 124 n.11 (2d Cir. 2018). Accordingly, this Court and others have had no difficulty reaffirming the general rule that all non-jurisdictional challenges are waived by a plea of guilty. *See United States v. Alarcon Sanchez*, 972 F.3d 156, 162 (2d Cir.

22

2020) (reaffirming, after *Class*, that "[w]here, as here, defendants challenge convictions based on unconditional guilty pleas, we understand them to have admitted all of the elements of their claims and to have waived all challenges to the prosecution except those going to the court's jurisdiction"); *United States v. Mladen*, 958 F.3d 156, 162 (2d Cir. 2020) (reaffirming, after *Class*, that "it is well established that a defendant who has entered an unconditional plea of guilty has admitted his guilt and has waived his right to raise any nonjurisdictional issues"); *United States v. Jennings*, 930 F.3d 1024, 1027 (8th Cir. 2019) (confirming, post-*Class*, that a guilty plea waives all non-jurisdictional claims, except any claims challenging the constitutionality of the statute of conviction); *United States v. Vasconcellos*, 772 F. App'x 539, 539 n.2 (9th Cir. 2019) ("An unconditional guilty plea waives all nonjurisdictional, antecedent defects and some constitutional claims." (citing *Class*, 138 S. Ct. at 805)); *United States v. Satterwhite*, 893 F.3d 352, 355 (6th Cir. 2018) ("[B]ecause he unconditionally pleaded guilty, Satterwhite waived all preceding non-jurisdictional defects in the proceedings." (citing *Class*, 138 S. Ct. at 805); *United States v. Rush*, 740 F. App'x 281, 282 (4th Cir. 2018) ("[B]ecause a valid guilty plea waives all prior, nonjurisdictional defects in a criminal proceeding, we conclude that Rush has waived his right to challenge the propriety of the court's rulings on his pretrial motion." (citing *Class*, 138 S. Ct. at 805)).

23

51.     Here, Andrew does not seriously challenge the constitutionality of the statutes as they apply to him; rather, he is arguing that his conduct does not constitute the federal crime with which he was charged. In other words, he is not arguing that the Government does not have the constitutional authority or power to criminalize his conduct, just that what he did is not a crime. As the Supreme Court and this Court have made clear, that claim is non-jurisdictional and is waived by Andrew's unconditional plea to the charged offense. *See Rubin*, 743 F.3d at 37.

52.     The difference between these two types of claims—a challenge to the constitutionality of the statute and a claim that the conduct does not constitute a criminal offense—is highlighted by their implications on the knowing and voluntary nature of the underlying guilty pleas. In *Class*, for example, the defendant admitted that he engaged in the conduct alleged in the indictment and that he was guilty of the crime charged. *See* 138 S. Ct. at 802. By challenging the constitutionality of the statute, the defendant in no way sought to disclaim those admissions. Instead, his argument was that the Constitution precluded the Government from making what he did a crime in the first instance. *See id.* at 804 ("Class' constitutional claims . . . are consistent with [his] knowing, voluntary, and intelligent admission that he did what the indictment alleged.").

53.     That is not the case here. To the contrary, what Andrew argues is that what he did is not a crime at all. Not only is this not a claim regarding the

Government's power, authority or jurisdiction, but it directly contradicts his admissions at his plea hearing. *See United States v. Van Der End*, 943 F.3d 98, 105 (2d Cir. 2019) (distinguishing "constitutional challenges to the statute of conviction," which are covered by *Class*, from claims that "contradict the terms of the indictment to which they pled guilty," which are not). Andrew pleaded guilty to committing wire fraud. *See* 18 U.S.C. § 1343. In the Plea Agreement, he acknowledged that "he . . . accepted this Agreement and decided to plead guilty because he is in fact guilty." (Ex. A at 4). At the plea hearing, Andrew stated under oath that he "transferred funds from [the victim's] three dissolution accounts . . . to other bank accounts that [he] opened. [Andrew] ultimately transferred those funds into the account of another nonprofit" that Andrew owned. (Dkt. 30 at 33). That is, he stole the victim's money and moved it into accounts under his control. Andrew's claims on appeal are flatly inconsistent with those admissions. Now he argues these acts constitute an improper "right-to-control" theory of liability and that additional information concerning the victim's independent contractor status indicates he did not violate any offense. (Br. 9-13). Thus, unlike the constitutional claim at issue in *Class*, Andrew's claims are inconsistent with his knowing and voluntary plea and are waived.

54.     Accordingly, Andrew's challenges to his conviction are waived by his unconditional guilty plea.

## II.    Andrew's Plea Agreement Bars His Sentencing and *Brady* Claims

### A.    Applicable Law

55.    Appeal waivers "'are presumptively enforceable.'" *United States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011) (quoting *United States v. Arevalo*, 628 F.3d 93, 98 (2d. Cir. 2010)).  This Court has "'repeatedly upheld the validity of [such] waivers' if they are 'knowingly, voluntarily, and competently provided by the defendant.'" *Id.* (quoting *United States v. Gomez-Perez*, 215 F.3d 315, 318 (2d Cir. 2000)); *see, e.g.*, *United States v. Lee*, 523 F.3d 104, 106-07 (2d Cir. 2008); *United States v. Roque*, 421 F.3d 118, 121-24 (2d Cir. 2005).  The "exceptions to the presumption of the enforceability of a waiver" are exceptionally limited and "occupy a very circumscribed area of [this Court's] jurisprudence." *Gomez-Perez*, 215 F.3d at 319.  This Court has declined to enforce such waivers "only in very limited situations, 'such as when the waiver was not made knowingly, voluntarily, and competently, when the sentence was imposed based on constitutionally impermissible factors, such as ethnic, racial or other prohibited biases, when the government breached the plea agreement, or when the sentencing court failed to enunciate any rationale for the defendant's sentence.'"  *Arevalo*, 628 F.3d at 98 (quoting *Gomez-Perez*, 215 F.3d at 319).  Accordingly, this Court has "upheld waiver provisions even in circumstances where the sentence was conceivably imposed in an illegal fashion or in violation of the Guidelines, but yet was still within

26

the range contemplated in the plea agreement." *Gomez-Perez*, 215 F.3d at 319; *see also, e.g.*, *United States v. Rosa*, 123 F.3d 94, 97 (2d Cir. 1997) ("This rule has been held to bar even those appeals which claim that the sentencing court illegally sentenced the defendant under the Guidelines and relevant statutes, so long as the court nevertheless imposed a sentence within the range outlined in the agreement."); *United States v. Yemitan*, 70 F.3d 746, 747-48 (2d Cir. 1995) (rejecting claim that waiver was "unenforceable because the district court's sentence was illegal" in light of court's failure to explain sentence as required by 18 U.S.C. § 3553(c)(1)).

**B.      Discussion**

56.     In his Plea Agreement, Andrew expressly waived his right to appeal his sentence of 366 days' imprisonment, agreeing that he would "not file a direct appeal; nor bring a collateral challenge . . . of any sentence within or below the Stipulated Guidelines Range of 21 to 27 months' imprisonment." (Ex. A at 4). During his plea proceeding, Andrew confirmed that he had had an opportunity to review the Plea Agreement with his attorney and understood its terms. (Dkt. 30 at 19). Judge Cronan also specifically brought to Andrew's attention the terms of the appeal waiver, and Andrew confirmed his understanding of those provisions. (Dkt. 30 at 30-31). Andrew's waiver was knowingly, voluntarily, and competently provided. Because Judge Cronan imposed a sentence of 366 days' imprisonment, a sentence well below the Guidelines range and one that Andrew agreed not to challenge on appeal,

Andrew's challenges to his sentence are barred by the appellate waiver in the Plea Agreement and should be dismissed. *See United States v. Pearson*, 570 F.3d 480, 485 (2d Cir. 2009) ("[I]n no circumstance may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement.").

57. None of the *Gomez-Perez* exceptions to the enforceability of appellate waivers is present here. Andrew does not contend that his plea or the waiver of his appellate rights was not knowingly, voluntarily, and competently made; as just discussed, he cannot credibly make any such claim. Nor does he, or can he, claim that his sentence was based on constitutionally impermissible factors or that the Government breached the Plea Agreement. And the District Court plainly "enunciate[d] [a] rationale for the defendant's sentence," *Gomez-Perez*, 215 F.3d at 319, explaining in detail the factors it weighed in determining Andrew's sentence.

58. The arguments in Andrew's brief, which attack his sentence, are barred because he has waived his right to appeal his sentence. As this Court has clarified, where the conduct an appellant challenges "was clearly part of the sentencing phase of [defendant's] case, [that] challenge is within the scope of his appeal waiver and is foreclosed." *Arevalo*, 628 F.3d at 97; *see also, e.g.*, *Yemitan*, 70 F.3d at 748 (holding claim of procedural error waived because "[i]f this waiver does not preclude

28

a challenge to the sentence as unlawful, then the covenant not to appeal becomes meaningless and would cease to have value as a bargaining chip in the hands of defendants."); *United States v. Fernandez*, 516 F. App'x 34, 36 (2d Cir. 2013) ("Because the government did not breach the plea agreement and because [defendant] does not assert another reason to set aside his appellate waiver, we will not consider his arguments regarding the procedural or substantive reasonableness of his sentence and dismiss his appeal."). Indeed, this Court has enforced appellate waivers in a variety of circumstances, including where the defendant claimed that the district court: "failed to give adequate reasons and discussed sentencing-related matters off the record in the court's chambers," *United States v. Coston*, 737 F.3d 235, 236-38 (2d Cir. 2013) (per curiam); failed to comply with Rule 32, *Arevalo*, 628 F.3d at 97; imposed an illegal sentence in violation of the parsimony clause of 18 U.S.C. § 3553(a), *United States v. Ruiz*, 272 F. App'x 19, 20-21 (2d Cir. 2008); failed to give the defendant an opportunity to seek safety valve relief pursuant to 18 U.S.C. § 3553(f), *United States v. DeJesus*, 219 F.3d 117, 120-21 (2d Cir. 2000); erred in calculating the Guidelines, *Rosa*, 123 F.3d at 101-02; and "failed in its duty under 18 U.S.C. § 3553(c)(1) to adduce reasons for imposing th[e] specific sentence, thereby rendering the sentence illegal," *Yemitan*, 70 F.3d at 746, 748.

59.    This Court's decision in *United States v. Buissereth*, 638 F.3d 114 (2d Cir. 2011), is instructive. There, the defendant had been sentenced within the range

of his appellate waiver but argued that the waiver was unenforceable because the sentencing court had "fail[ed] to make rulings and findings at his sentencing hearing." *Id.* at 117.  This Court found that the District Court had failed to: rule on objections to the Presentence Report; rule on requests for downward departures and a variance; adopt the findings of the Presentence Report; "mention, much less articulate its consideration of, the relevant factors set forth in 18 U.S.C. § 3553(a)"; or calculate an applicable Guidelines range.  *Id.*  This Court nonetheless enforced the appellate waiver, concluding that the district court's multiple errors did not constitute sentencing "entirely at the whim of the district court" or "an arbitrary practice of sentencing without proffered reasons [that] would amount to an abdication of judicial responsibility." *Id.* at 118.   Nor was the sentence "fundamentally unfair." *Id.*  Accordingly, even if Andrew's claim that Judge Cronan erred by considering non-economic factors—which is not an error—such purported errors are no more severe than those identified in *Buissereth*, which this Court found insufficient to set aside a valid appellate waiver.

60.    Andrew also expressly waived his right to attack his conviction based on *Brady*, except to the extent that the purportedly withheld information "establish[es] the factual innocence of the defendant." (Ex. A at 4-5).  Andrew does not specifically identify the purported *Brady* material but appears to reference a disclosure made by the Government in advance of sentencing.  Andrew does not

attempt to argue that material establishes his "factual innocence"—it did not—although Andrew claims, without explanation, the material furthers his "right-to-control" argument above. In any event, a claim of factual innocence would be untenable in light of Andrew's admissions during his plea allocution, which he does not disavow. Accordingly, Andrew's *Brady* claim is likewise waived. *See United States v. Barreras*, 494 F. App'x 115, 118 (2d Cir. 2012) (enforcing Brady waiver).

61. Andrew does not meaningfully address his waivers of his right to appeal his sentence and his right to attack his conviction based on *Brady*. He offers no explanation for why the waivers should not apply and fails completely to address the law on this issue. Given the clear record here, which demonstrates that Andrew competently, knowingly, and voluntarily waived his right to bring the claims he seeks to raise on appeal, his appeal should be dismissed.

## CONCLUSION

62.     For the foregoing reasons, Andrew waived his appellate claims, and his

appeal should be dismissed.[2]

Dated:        New York, New York
              May 16, 2023


                                 /s Ryan B. Finkel
                                 Ryan B. Finkel
                                 Assistant United States Attorney
                                 Telephone: (212) 637-6612

---

[2] Should the Court deny this motion, the Government respectfully requests that it be permitted to file a brief within 60 days of the date of entry of the order denying this motion.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A), the undersigned counsel hereby certifies that this opposition complies with the typeface requirements of the Federal Rules of Appellate Procedure. As measured by the word processing system used to prepare this opposition, there are 7499 words in this motion. Concurrently filed with this motion is a Motion for Leave to File an Oversized Motion.

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:                                                    RYAN B. FINKEL,
                                                    *Assistant United States Attorney*

# EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 3, 2022

**By Email**
Edward Young Kyu Kim, Esq.
Krieger Kim & Lewin LLP
500 Fifth Avenue, 34th Floor
New York, NY 10110
212-390-9550
edward.kim@kklllp.com

      Re: *United States v. Seth Andrew*, 21 Cr. ____

Dear Mr. Kim:

      On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Seth Andrew ("the defendant") to Count One of the above-referenced Information.

      Count One charges the defendant with wire fraud, in violation of Title 18, United States Code, Section 1343, and carries a maximum term of imprisonment of 20 years, a maximum term of supervised release of 3 years, a maximum fine of $250,000 or, pursuant to Title 18, United States Code, Section 3571 of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.

      In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which this Office cannot, and does not, make any agreement) for the conduct described in the Complaint, dated April 20, 2021, *United States v. Seth Andrew*, 21 Mag. 4262, as charged in Count One of the above-referenced Information and, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Counts against the defendant. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

      The defendant further agrees to make restitution in the amount of $218,005 in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664. The defendant further agrees to pay the full amount of restitution on the date of sentencing.

The defendant hereby admits the forfeiture allegation with respect to Count One of the Information and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c) a sum of money equal to $240,542.47 in United States currency, representing proceeds traceable to the commission of said offense (the "Money Judgment"). It is further agreed that the defendant shall pay $22,537.47 on or before the date of sentencing, which the Government shall accept in full satisfaction of the Money Judgment. In the event that the defendant fails to remit the $22,537.47 payment and payment for the full amount of restitution on or before the date of sentencing, the full Money Judgment will remain due. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture. The defendant consents to the entry of the Consent Order of Forfeiture annexed hereto as Exhibit A and agrees that the Consent Order of Forfeiture shall be final as to the defendant at the time it is ordered by the Court.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

**A. Offense Level**

1. The applicable Guidelines manual is the 2018 edition.

2. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven because the statutory maximum term of imprisonment for Count One is 20 years or more.

3. Pursuant to U.S.S.G. § 2B1.1(b)(1)(F), the offense level is increased by 10 levels because the actual or intended loss amount exceeded $150,000, but was not greater than $250,000.

4. Pursuant to U.S.S.G. § 2B1.1(b)(9), the offense level is increased by two levels because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency.

5. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 16.

2021.09.20

**B. Criminal History Category**

Based upon the information now available to this Office (including representations by the defense), the defendant has zero criminal history points.

In accordance with the above, the defendant's Criminal History Category is I.

**C. Sentencing Range**

Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 21 to 27 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 16, the applicable fine range is $10,000 to $95,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the

determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241, of any sentence within or below the Stipulated Guidelines Range of 21 to 27 months' imprisonment and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal or bring a collateral challenge of any term of supervised release that is less than or equal to the statutory maximum. The defendant also agrees not to appeal or bring a collateral challenge of any fine that is less than or equal to $95,000, and the Government agrees not to appeal or bring a collateral challenge of any fine that is greater than or equal to $10,000. The defendant also agrees not to appeal or bring a collateral challenge of any restitution amount that is less than or equal to $218,005, and the Government agrees not to appeal or bring a collateral challenge of any restitution amount that is greater than or equal to $218,005. The defendant also agrees not to appeal or bring a collateral challenge of any forfeiture amount that is less than or equal to $240,542.47, and the Government agrees not to appeal or bring a collateral challenge of any restitution amount that is greater than or equal to $240,542.47. The defendant also agrees not to appeal or bring a collateral challenge of any special assessment that is less than or equal to $100. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act

material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his removal from the United States is presumptively mandatory and that, at a minimum, he is at risk of being removed or suffering other adverse immigration consequences. If the defendant is a naturalized citizen of the United States, he recognizes that pleading guilty may have consequences with respect to the defendant's immigration status. Under federal law, an individual may be subject to denaturalization and removal if his naturalization was procured by concealment of a material fact or by willful misrepresentation, or otherwise illegally procured. The defendant acknowledges that he has discussed the possible immigration consequences (including removal or denaturalization) of his guilty plea and conviction with defense counsel. The defendant affirms that he wants to plead guilty regardless of any immigration or denaturalization consequences that may result from the guilty plea and conviction, even if those consequences include denaturalization and/or removal from the United States. The defendant understands that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and the defendant understands that no one, including his attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from his guilty plea and conviction.

It is further agreed that should the conviction(s) following the defendant's plea(s) of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

2021.09.20

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By:

Ryan B. Finkel
Assistant United States Attorney
(212) 637-6612

APPROVED:

Christopher DiMase
Timothy Howard
Co-Chiefs, Complex Frauds and Cybercrime

AGREED AND CONSENTED TO:

Seth Andrew

1/14/22
DATE

APPROVED:

Edward Young Kyu Kim, Esq.
Attorney for Seth Andrew

1/14/22
DATE

2021.09.20